## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| **MARK A. LYONS AND KATHERINE M. LYONS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action** |
| | ) | **File No.:** |
| **ATLANTA ESCROW & EXCHANGE SERVICE,** | ) | |
| **INC., ALLIED BUSINESS SOLUTIONS, INC.,** | ) | |
| **LEONARDO SALINAS BELTRONES, CHARLES** | ) | |
| **NELSON, BLAKE SHIPLEY, JENNIFER MENDOZA,** | ) | |
| **JOHN CORTEZ, MARK ALLEN, ADAM TAYLOR,** | ) | |
| **FRANK CALLOWAY, AND KELLY GOMEZ** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>COMPLAINT</u>

Plaintiffs Mark A. Lyons and Katherine M. Lyons bring this Complaint

for fraud, civil conspiracy to commit fraud, civil violations of the Federal

Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1964(c))

("Federal RICO") and civil violations of the Georgia Racketeer Influenced and

Corrupt Organizations Act against Defendants Atlanta Escrow & Exchange

Service, Inc. ("Atlanta Escrow"), Allied Business Solutions, Inc. ("Allied

Business"), Leonardo Salinas Beltrones ("Beltrones"), Charles Nelson ("Nelson"),

Blake Shipley ("Shipley"), Jennifer Mendoza ("Mendoza"), John Cortez

("Cortez"), Mark Allen ("Allen"), Adam Taylor ("Taylor"), Frank Calloway

("Calloway"), and Kelly Gomez ("Gomez") showing this Court the following:

## PRELIMINARY STATEMENT

This is a case involving multiple acts of fraud committed by email, the

internet, and telephone by the individual and company Defendants named herein,

acting together in concert in an ongoing conspiracy to mislead Plaintiffs into

funding an elaborate, illicit scheme designed and intended to either convert

Plaintiffs' funds and to launder money.  The scheme is centered on the purchase

and sale of Plaintiffs' timeshare property, which was not for sale when Defendants

first approached with a purchase offer.  Defendants offered Plaintiffs a fair price

for the purchase - $43,500, and emailed a Purchase Contract for Plaintiffs to sign.

A copy of that contract is attached hereto as Exhibit A.  Immediately after

executing the Purchase Contract, Defendants began demanding fees from Plaintiffs

in order to get the purchase to close.  Defendants have used Plaintiffs' fear of

breaching this Purchase Contract and losing the funds they were duped into paying

to extract hundreds of thousands of dollars from Plaintiffs.

It is clear based on a current search of Better Business Bureau activity and

other sources that these Defendants, or some part of this Defendant group, have

engaged in this type of illicit scheme with other unsuspecting timeshare property

owners previously and currently.  Online, Defendants brazenly defend the tactics used in this case and in other cases.  It is clear that these Defendants will continue to prey on unsuspecting and trusting victims until this Court or law enforcement puts a stop to it.

## PARTIES

### 1.

Plaintiffs Mark A. Lyons and Katherine M. Lyons are residents of the State of Washington who were approached in 2021 by Defendants about selling the Mexico Timeshare Property ("the Timeshare Property") that they owned.

### 2.

Defendant Atlanta Escrow is a Georgia corporation with its principal office located at 2002 Summit Boulevard, Suite 300, Atlanta, GA 30319.  It may be served with process on its registered agent for service, Charles Nelson, located at 980 Faith Avenue SE, Atlanta, GA 30316.

### 3.

Defendant Allied Business is a Georgia corporation with its principal office located at 715 Peachtree Street, NE, Atlanta, GA 30308.  Allied Business may be served with process on its registered agent for service, Blake Shipley, located at 1204 Highland Bluff Drive, SE, #204, Atlanta, GA 30339.

4.

Defendant Blake Shipley is the CEO of Allied Business, is an individual participant in the fraudulent acts described below, and is a resident of Georgia, and he may be served with process at 1204 Highland Bluff Drive, SE, #204, Atlanta, GA 30339.

5.

Defendant Charles Nelson is the CEO of Defendant Atlanta Escrow, is an individual participant in the fraudulent acts described below, and is a resident of Georgia, and he may be served with process at 980 Faith Avenue SE, Atlanta, GA 30316.

6.

Defendant Jennifer Mendoza is an individual participant in the fraudulent acts described below, and is believed to be a resident of Georgia employed by Allied Business and may be served with process at 1204 Highland Bluff Drive, SE, #204, Atlanta, GA 30339 or at any location where she may be located.

7.

Defendant John Cortez is an individual participant in the fraudulent acts described below, and is believed to be a resident of Georgia employed by Allied

Business and may be served with process at 1204 Highland Bluff Drive, SE, #204, Atlanta, GA 30339 or at any location where she may be located.

8.

Defendant Mark Allen is an individual participant in the fraudulent acts described below, and is believed to be a resident of Georgia employed by Defendant Atlanta Escrow and may be served with process at 980 Faith Avenue SE, Atlanta, GA 30316 or at any location where he may be located.

9.

Defendant  Adam Taylor is an individual participant in the fraudulent acts described below, and is believed to be a resident of Georgia employed by Defendant Atlanta Escrow and may be served with process at 980 Faith Avenue SE, Atlanta, GA 30316 or at any location where he may be located.

10.

Defendant Frank Calloway is an individual participant in the fraudulent acts described below, and is believed to be a resident of Georgia employed by Defendant Atlanta Escrow and may be served with process at 980 Faith Avenue SE, Atlanta, GA 30316 or at any location where he may be located.

11.

Defendant Kelly Gomez is an individual participant in the fraudulent acts described below, and is believed to be a resident of Georgia employed by Defendant Allied Business and may be served with process at 1204 Highland Bluff Drive, SE, #204, Atlanta, GA 30339 or at any location where she may be located.

12.

Defendant Beltrones is believed to be a foreign national living in Mexico, who is a co-conspirator in the fraudulent acts described below.  He may be served with process in this case wherever he can be located.

## JURISDICTION AND VENUE

13.

This Court has original subject-matter jurisdiction pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because this action arises, in part, under the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal RICO").  This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs and there is complete diversity of citizenship between Plaintiff and the Defendants.  This Court has jurisdiction over Plaintiffs' related state and common law claims pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

14.

This Court has personal jurisdiction over Defendants in this Case because each of these Defendants personally and purposefully directed actions at Plaintiffs in this forum to obtain benefits through the two Georgia company Defendants, Atlanta Escrow and Allied Business.

**FACTS**

15.

On July 20, 2021, Mark Lyons received a call from Defendant John Cortez at Defendant Allied Business Solutions asking if he and his wife would be interested in selling their Mexico timeshare, at Villa Del Palmar ("the Timeshare Property"). Cortez said he was familiar with the property and that he had a buyer. Plaintiffs told him it would depend on the price. Cortez followed up with a call stating the purchase price would be $43,500.  Plaintiffs considered that a fair price given they had spent roughly that amount to acquire it. Mark Lyons sent an email to Cortez stating Plaintiffs' intent to sell.  In reality there was never any intention by any Defendant to actually purchase the Timeshare Property.

16.

On July 29, 2021, Defendant Cortez emailed the contract and account setup documents to Plaintiffs.  Plaintiffs were encouraged by the facts that both the

broker and the escrow company were US companies and that the money would be kept by them in an escrow.  In reality, the account setup documents were fake and were intended to dupe Plaintiffs into participating in Defendants' illicit financial scheme.

17.

On August 2, 2021, Plaintiffs entered into an agreement to sell the Timeshare Property for $43,500 to Defendant Beltrones.  (See Exhibit A).

18.

On August 4, 2021, Plaintiffs received an email from Defendant Cortez stating the closing date was scheduled for September 17, 2021.  In reality, this and all subsequent closing dates were fake, Defendants never intended to close on this purchase.  Cortez knew this, thereby making misrepresentations of material fact as to the purchase and sale of the Timeshare Property.

19.

On August 9, 2021, Defendant Cortez forwarded an email from Defendant Atlanta Escrow stating that the Mexico government was requiring a $4,600 fee to issue a Tax ID to a non-Mexico citizen.  Defendant Atlanta Escrow stated that they verified the fee and verified that the buyer, Defendant Beltrones, would reimburse Plaintiffs at closing for this fee. Cortez followed with a call stating he had never

run into this before, and the Mexican government appears to be adding fees where they can to generate revenue. Cortez forwarded a copy of the "invoice" for this fee. The "invoice" now appears to be fake, and this fake fee was one of many fees Defendants added to this transaction.

20.

**Temporary Tax ID Fee -** Plaintiffs sent $4,600 and the completed Tax ID paperwork to Defendant Atlanta Escrow. On August 9, 2021, Plaintiffs were contacted by Defendant Mendoza who stated Defendant Cortez was out of the office. Plaintiffs shared with her that Plaintiff's wife, Katherine Lyons, was nervous about wiring money to Mexico.

21.

Defendant Mendoza told Plaintiffs that there was a bank account where they could view the funds. She would contact Defendant Atlanta Escrow about providing that information. This was typical of every call Plaintiffs made to Defendants – Defendants had an answer for every concern Plaintiffs expressed, or they had the threat of default on the Purchase Contract for every hesitation by Plaintiffs on complying with a new funding demand, with Plaintiff being intimidated at every turn with the threat of losing all of the money they had paid in to date.

22.

On August 17, 2021, Defendant Calloway provided login information for the account. Plaintiffs told him that they needed more information about their company and the banking process. On August 18, 2021, Defendant Calloway sent an email containing information about Defendant Atlanta Escrow, a bank statement, and a screen shot of their Business Registration.  In reality, this documentation was fake, Defendants Mendoza and Calloway knew that it was fake and intended to mislead Plaintiffs with this documentation.

23.

On August 25, 2021, Defendant Calloway sent an attachment notifying Plaintiffs of a new fee, the **SRE Permit Fee, of $3,700**. Plaintiffs wired $3,700 for the SRE Permit Fee to the escrow account Defendant Atlanta Escrow set up at Banco Santander.

24.

On August 31, 2021, Defendant Atlanta Escrow sent an email response to Plaintiffs' concern about the escrow stating that Defendant Atlanta Escrow owns and operates Elisma S. De R.L De C.V. in Mexico, the location of the escrow office and account.

25.

**16% IVA Tax of $6,960 -** On September 10, 2021, Plaintiffs received email from Defendant Cortez stating he was contacting Defendant Atlanta Escrow to better understand the new fee. Plaintiffs wired the payment of $6,960 on September 10, 2021. On September 17, 2021, Cortez told the Plaintiffs that he had not been able to confirm that the IVA tax had been paid yet since it was a Mexico holiday, but still planned on closing the sale of the Timeshare Property on September 18, 2021.  In reality, this tax was fake and Defendant Cortez played an integral role in the illicit scheme and conspiracy to commit fraud on Plaintiffs.

26.

On September 17, 2021, Defendant Cortez stated that wire had not cleared yet and that it may be Monday for close (9/20/2021).

27.

On September 20, 2021, Plaintiffs received no news on wire or close.

28.

On September 21, 2021, Defendant Cortez forwarded email from Defendant Atlanta Escrow stating that the Mexico government had added another fee - **Closing & Administration Fee for $8,490**. Defendant Atlanta Escrow stated the buyer had already deposited their reimbursement. Defendant Atlanta Escrow

further states that as soon as the new fee is paid they will be able to move to closing. **Closing & Administration Fee** of $8,490 was wired by Plaintiffs. Defendant Atlanta Escrow stated they could move to closing as soon as the fee was paid.

29.

On September 22, 2021, Defendant Mendoza called letting Plaintiffs know that she has their account now. She told them she understands their frustration and acted genuinely concerned. Plaintiffs shared their fear that this transaction was a fraud or some kind of scam. Plaintiffs were not comfortable with sending any more money.  In response to Plaintiffs' fears, Defendants called or emailed with understanding and promises that the deal would close immediately.

30.

On September 23, 2021, Defendant Mendoza forwards an email from Defendant Adam Taylor, escrow officer at Defendant Atlanta Escrow, providing a Guarantee Letter that is very similar to the last one.  In reality, each "Guarantee Letter" sent by Defendant Atlanta Escrow was fake, and was sent in furtherance of Defendants' illicit scheme.  Each Guarantee Letter promised the reimbursement of all fees and appeared to be an enforceable guarantee of performance by a company set up to guarantee these kinds of transactions.

31.

On October 1, 2021, emails were exchanged asking about the closing date. Defendant Mendoza confirmed on October 1, 2021 the funds cleared. Per the Defendant Atlanta Escrow email, Plaintiffs were expecting the funds shortly after the **"Closing & Admin Fee"** was paid.

32.

On October 5, 2021, Defendant Mendoza forwarded an email from Defendant Taylor stating the Mexican government is requiring another fee for **Excess Income in the amount of $11,758.50**. During a call on that date, Plaintiffs stated that Plaintiffs needed a letter that specifically stated that once they paid this tax they would move forward to close. **18% Excess Income Tax of $11,758.50**, wired per directions after receiving a new Guarantee Letter by email from Defendant Atlanta Escrow.

33.

On October 7, 2021, Defendant Mendoza forwarded a letter of guarantee from Defendant Atlanta Escrow stating that once Plaintiffs paid the Excess Income Tax, Plaintiffs shall receive full payment at a closing to happen immediately after. Defendant Atlanta Escrow went on to state the Mexican Government confirmed

that there are no other applicable taxes. Plaintiffs advised Defendant Mendoza

know that US Bank cancelled the wire transfer for the Excess Income Tax in error

and that US Bank would resend.

34.

On October 21, 2021, several calls and emails were exchanged between

Defendant Mendoza and Plaintiffs checking on the status of closing, as it had been

over a week since Defendant Atlanta Escrow confirmed the wire. At this point

Plaintiffs were afraid to push back on Defendants because the terms of the

Purchase Contract threatened the loss of all funds paid to date.

35.

On October 25, 2021, Defendant Mendoza forwarded an email from

Defendant Atlanta Escrow that Mexico is ready to issue the Free & Clear and the

Erasure of Records but the additional fees need to be paid first. Plaintiffs replied to

Defendant Mendoza that the previous agreement was that the last payment

Plaintiffs made was truly the last payment due and the Mexican government would

issue these documents.

36.

**Erasure of Records Fee ($8,430) & Free and Clear Certificate Fee**

**($6,800)** - On October 27, 2021, Defendant Mendoza emailed Plaintiffs letting

them know that Defendants were having various discussions trying to figure out how to get the purchase and sale of the Timeshare Property completed. On November 1, 2021, Mendoza sent Plaintiffs email confirming Plaintiffs' own bank information for payout when deal finally closes, leading Plaintiffs to believe that they were in fact about to be paid back and the deal was about to be closed.

37.

On or about November 4, 2021, Plaintiffs had a series of calls with Defendant Taylor and Defendant Mendoza. Taylor shared that he had a hard time understanding how the Mexican government could keep adding fees but that this was it. Plaintiffs expressed to Taylor, represented to be an escrow officer, that Plaintiffs were very displeased and that taxes and fees on top of each other has brought the balance of the transaction well beyond the value of the timeshare. After many assurances from Taylor that all funds would be reimbursed, Plaintiffs wired the funds to the escrow account maintained by Defendants on 11/5/2021.

38.

On November 10, 2021, Defendant Mendoza sent Plaintiffs an email saying, "I have great news for you. Please call." Defendant Mendoza forwarded Defendant Atlanta Escrow email from Defendant Taylor with attached copy of the Outgoing Wire transfer order for Plaintiffs' closing payment, showing that the final payout

was being made and the deal was closing.  Plaintiffs were very encouraged by this news.

39.

On November 17, 2021, Defendant Mendoza forwarded an Defendant Atlanta Escrow email from Defendant Taylor informing Plaintiffs that the Mexican government stopped the wire at the intermediary bank stating that Plaintiffs had not paid the **20% Capital Gains Tax**. Taylor reminded Plaintiffs that this tax payment would be reimbursed by the buyer. This 20% tax, like the other fees and taxes, is on the entire amount so the Capital Gains Tax will be $18,482.70.

40.

On November 18, 2021, Plaintiffs requested to speak to Defendant Taylor at Defendant Atlanta Escrow. On Friday, November 19, 2021, Defendant Mendoza advised Plaintiffs that Taylor was too busy and he would contact Plaintiffs on Monday.

41.

On November 14, 2021, Plaintiffs were emailed a letter from a Mexican Government Agency Hacienda SAT that assessed the Capital Gains tax confirmed that there would be no additional requirements.

42.

On November 19, 2021, Plaintiffs wired the 20% Capital Gains Tax of $18,482.70, after receiving a letter from a Mexican Government Agency confirming that all of the funds would be disbursed once the 20% Capital Gains Tax was paid. Again, Plaintiffs were assured that the buyer would reimburse this tax and Plaintiffs asked for proof of the funds. In reality, this letter and all other letters on Mexican Government Agency letterhead were fake and were manufactured by Defendants to keep Plaintiffs in line in furtherance of the illicit scheme to defraud Plaintiffs.

43.

On December 3, 2021, Defendant Mendoza stated that the funds for the closing had cleared in the account, and payment was expected on Monday, December 6, 2021.  On December 7, 2021, Defendant Mendoza forwarded an email from Defendant Taylor of Defendant Atlanta Escrow stating that now the intermediary bank HSBC claims they are owed 15% interest in the amount of $16,641.93 on the transaction. Defendant Atlanta Escrow claims they could not get HBSC to remove it but restated this is the last payment. Plaintiffs stated their frustration. Plaintiffs also let Mendoza know that the transaction will cost Plaintiffs

more in taxes, fees and interest from selling stock and accessing accounts.

Plaintiffs asked for proof that HSBC was charging 15%.

44.

On December 10, 2021, Plaintiffs were sent an email that attached a letter

from HSBC requiring 15% interest payment of $16,641.93 to release the funds.

Defendant Atlanta Escrow denies knowing that this would occur and promising

that Defendant Beltrones would reimburse Plaintiffs in full at closing.  In reality,

the HSBC letter was fake and was manufactured by Defendants for the improper

purpose of continuing to mislead Plaintiffs and to convince Plaintiffs to continue

contributing to the escrow account fund that Defendants were controlling.

45.

On December 13, 2021, Defendant Mendoza sent an email stating Defendant

Atlanta Escrow realized there was an error on the wire instructions and to hold off

wiring.  On December 20, 2021, Defendant Mendoza forwarded new wire

instructions. It now appears that this week-long delay was intended to give

Defendants time to prepare for the next request for money. On December 21, 2021,

Plaintiffs wired the 15% payment of $16,641.93.

46.

On January 4, 2022, Defendant Mendoza sent notice to Plaintiffs by email

that Defendant Beltrones now demanded a Good Faith Deposit.  Defendants

claimed the Mexican government froze the process because of the size of the

transaction and Defendant Beltrones was willing to move to a private account but

wanted a Good Faith payment to show that Plaintiffs were still on board. Plaintiffs

were furious at this demand and began suspecting that this transaction was either

fraud, money laundering or some other type of tax scheme. Defendant Mendoza

had previously made comments on calls that all payments needed to come from

Plaintiffs so Beltrones could show that he was reimbursing Plaintiffs for an

expense for tax reasons.

47.

This 18% Good Faith payment made no sense. On January 5, 2022,

Plaintiffs sent email expressing concern that Defendant Atlanta Escrow

"negotiated" this fee with Beltrones and Plaintiffs had no input.

48.

On January 12, 2022, Plaintiffs had a phone call with Defendant Taylor and

expressed their displeasure. They questioned the logic of paying a Good Faith

payment that Beltrones is going to reimburse them for at the closing.  This kind of

penalty continued to drain Plaintiffs of funds, but now they felt trapped in this

transaction.

49.

On January 14, 2022, Defendant Taylor sent Plaintiffs a copy of a Santander bank account to demonstrate Plaintiffs' money was secure in an account under Plaintiffs' names. The purported sale of the Timeshare Property had now cost Plaintiffs balance of $150,712. Taylor stated on a call this was the only way forward. In reality, the Santandar Bank account documents used here were fake and were intended to convince Plaintiffs to rely on Taylor's word that their money was safe.

50.

Following the January 14, 2022 letter from Defendant Taylor, Plaintiffs felt like Plaintiffs had no choice but to proceed or Beltrones would walk away and Defendant Atlanta Escrow would have to release the funds to him. Plaintiffs believed Defendants' representations that if the deal were cancelled at this point, they would have to go back to each Mexican agency to get the funds back. Defendants claimed the account was a secured account that Beltrones could only deposit into but could not withdraw and Defendant Atlanta Escrow would not grant permission for Beltrones to withdraw funds.

51.

**18% Good Faith Deposit for $22,975.86** – On January 21, 2022, Plaintiffs

sent an email to Defendant Mendoza to capture a discussion they had earlier where Mendoza confirmed that at least two other clients were involved in a transaction with Beltrones and received their money.

52.

After a discussion with Defendants Taylor and Mendoza, Plaintiffs felt they had no choice but to pay the Good Faith Deposit and on January 21, 2021, Plaintiffs sent the payment for $22,975.86.

53.

On January 27, 2022, Defendant Mendoza forwarded an email from Defendant Taylor stating the funds have been transferred to the escrow account set up for Mr. and Mrs. Lyons. This email was in furtherance of Defendants' fraudulent scheme intended to make Plaintiffs feel comfortable with the phone transaction.

54.

On February 2, 2022, Plaintiffs spoke with Defendant Mendoza. She sounded very unhealthy. Plaintiffs shared their concern that they have not received the funds yet and suspect something else is going on again.  She followed up with an email on February 2, 2022 that she was too sick to go into the office and her boss would follow up with Plaintiffs.

55.

Also on February 2, 2022, Defendant Mendoza forwarded email from Defendant Taylor of Defendant Atlanta Escrow stating the Mexican government was requiring a **19% Border Adjustment Tax of $28,625.97**. In follow up calls, Plaintiffs were told that the Mexican government intercepted the wire transfer.

56.

On February 4, 2022, Defendant Mendoza responded on a phone call to Plaintiffs' question asking how Plaintiffs can cancel the transaction. She stated that they have never had such a complicated transaction and cancelling it would include going back to all the Mexican agencies and would include a 20% penalty per the terms of the Purchase Contract.

57.

After that call, Plaintiffs had multiple calls with Defendant Mendoza, Defendant Taylor and Defendant Calloway. Plaintiffs' finances and relationship were very stressed at this time. Plaintiffs made it very clear to Defendant Atlanta Escrow and Defendant Allied Business that this prolonged transaction was causing incredible financial and emotional stress. Plaintiffs informed Defendants that the Border Adjustment Tax would be the last payment they would make and then they would seek legal counsel from a Georgia attorney. When Plaintiffs mentioned

seeking legal counsel, Defendants reminded Plaintiffs that Plaintiffs need to provide a written, signed document giving Defendants 90 days to solve before going to outside counsel, media, etc., per the terms of the Purchase Contract.

58.

On February 11, 2022, Plaintiffs received a long email answering Plaintiffs' concerns about Defendant Atlanta Escrow not protecting Plaintiffs. It was evident that Defendant Atlanta Escrow was in over its head or not being transparent about the transaction.

59.

At this point, Plaintiffs suspected that this was never about a simple timeshare purchase. Beltrones has multiple transactions going on with Defendant Atlanta Escrow and appears to be fine with the escrow account balance growing. He even contributed to the financial burden by demanding a Good Faith payment that Defendant Atlanta Escrow went along with without my input. Defendant Atlanta Escrow acts to add fees not covered by the Purchase Contract, but relies on the Purchase Contract when Plaintiffs object to anything.

60.

On March 4, 2022, Plaintiffs paid the 19% Border Adjustment Tax in the amount of $28,625.97 to the escrow account set up by Defendants. Plaintiffs then

asked Defendant Mendoza to connect them with a client who has been paid out, because Defendant Mendoza and Defendant Calloway had mentioned that Plaintiffs' delays have allowed the Mexican government to catch Plaintiffs' transaction but others have received their payments.

61.

On or about February 23, 2022, Defendant Calloway sent Plaintiffs contact information for Roy & Karla Ericsson. Plaintiffs spoke with Roy Ericsson who stated it was a frustrating deal but he did recently receive his payment after paying the Border Adjustment Tax. The Ericsson phone number is no longer valid raising Plaintiffs' concern that it wasn't a real client. When confronted by Plaintiffs' concerns that this was a fake former client, Defendants subsequently claimed that the couple just wanted to put the transaction behind them so they disabled that phone line.

62.

Following multiple discussions and pleading from Defendants, and following Plaintiffs' conversation with Roy Ericsson, the former client, Plaintiffs wired the Border Adjustment Tax to the escrow account set up by Defendants.

63.

On March 15, 2022, Defendant Calloway emailed Plaintiffs stating the Bank

of Mexico is applying a "SPEI" fee to the Timeshare Purchase transaction.

Plaintiffs called Calloway and he stated there is nothing Defendants can do about

this kind of fee because it comes from the Mexican government and the banks

involved in this case. He provided the wire information for Plaintiffs to make the

payment but not a new addendum to the Purchase Contract.

64.

On March 21, 2022, Defendant Kelly Gomez replaced Defendant Mendoza

who went out on leave.  She forwarded the new Guarantee Letter addendum

reflecting the SPEI  fee in the amount of $33,064.01.

65.

On March 23, 2022, Plaintiffs sent a lengthy email to Defendants stating

their frustration and summarizing the history of the transaction. Plaintiffs stated

that Plaintiffs had no more funds and were losing trust in the Defendant

companies. Plaintiffs finished with a request for Defendants to bring the

transaction to a close with no further funding from Plaintiffs or Plaintiffs will have

to engage legal counsel. Plaintiffs did not receive an email response from any

Defendant.

66.

On April 4, 2022, in response to numerous calls between Plaintiffs and

Defendant Gomez, Plaintiffs were sent a letter from Defendant Allied Business CEO Shipley "irrevocably guaranteeing" that Plaintiffs would be paid out within 72 hours after Plaintiffs completed the payment to the escrow account at Banco de Mexico for the SPEI fee of $33,064.01.

67.

On April 11, 2022, Plaintiffs sent an email to Defendant Gomez stating that they appreciate the letter but there is nothing contained in that letter stating what will happen if Plaintiffs don't get paid. Plaintiffs requested that the SPEI fee be the final payment, that Defendant Atlanta Escrow can simply retain the fee that was reimbursed by Defendant Beltrones to pay the bank, and send Plaintiffs funds immediately.

68.

In one of Plaintiffs' discussions with Defendant Gomez, Plaintiffs asked for proof of the SPEI fee. Plaintiffs received a letter on Bank of Mexico letterhead. At the time Plaintiff didn't realize the letter only referred to a debt, not the SPEI fee or explain what it was, only that Plaintiffs need to pay it for the fees to be released. In reality, the Bank of Mexico letter was fake.

69.

On April 21, 2022, Plaintiffs attempted to make changes to the Purchase

Contract by preparing their own Addendum because the contract itself appeared to have expired after 180 days.  Plaintiff offered to have the SPEI payment be the final payment, and confirmed that no party has breached and added terms and conditions. The liquidated damages clause in original contract was removed. And the Addendum proposed that if Plaintiffs were not paid by 5/16/2022, the Purchase Contract would terminate and Plaintiffs would be refunded all of their money back.

70.

On April 26, 2022, Defendants responded by phone through Defendant Gomez stating that Defendants would not sign Plaintiffs' Addendum because it changed the original Purchase Contract. Defendants refused to consider Plaintiffs' suggestions to modify the purchase contract.  Plaintiffs told Defendants that Plaintiffs need a guarantee that this would be the last payment and that they were consulting with counsel in Georgia. Defendant Gomez told Plaintiffs that five of their clients have now closed and that she would take their request back to her leadership. That was the last Plaintiffs heard from Gomez.

71.

Around April 26, 2022, Defendant Mendoza returned to work and replaced Kelly Gomez.  Defendant Mendoza sent an email to Plaintiffs raising concern that further delay in paying required fees will allow "the [Mexican government] SAT to

connect names and amounts of this operation and raise a red flag".  Mendoza told Plaintiffs that Plaintiffs' attorneys have no international experience and were not qualified to advise Plaintiffs in this matter – trying to create doubt about Plaintiffs' efforts to challenge Defendants' actions.  Mendoza stressed that Defendant Atlanta Escrow's strategy is the best approach for Plaintiffs to get Plaintiffs' funds. She stated that Defendant Atlanta Escrow would send Plaintiffs' funds the day the SPEI fee wire posted.

72.

On May 10, 2022, Defendant Mendoza sent Plaintiffs an email stating that Defendants had not heard from Plaintiffs, warning Plaintiffs that further delay could result in default fees being imposed. She refers to a strategy that she discussed with Plaintiffs around May 2, 2022 that Defendant Atlanta Escrow is certain this is the last payment, that other clients have received their payments, and that Defendant Atlanta Escrow will release Plaintiffs' funds as soon as Plaintiffs show proof of the SPEI fee wire. Finally she reminded Plaintiffs, "...failure to comply with the pending requirement could result in the loss of all funds invested in this transaction."  This was the threat Plaintiffs were regularly given when they hesitated to pay what Defendants demanded.

73.

On May 15, 2022, Plaintiffs repeated all frustrations and concerns to Defendant Taylor. He seemed understanding and was also convinced that this payment would finalize the transaction given others have received their funds. He stated he would provide some references but had to check with them first.

74.

On May 19, 2022, Defendant Taylor provided contact info for a client who had recently closed on a Beltrones' transaction - James Wood.  Plaintiffs spoke with Mrs. Wood, who seemed very genuine.  Mrs. Wood stated they came down to the last minute as they were trying to close a real estate deal and really needed the money. Plaintiffs asked how she gained the confidence to move forward. She stated she really trusted Defendant Mendoza. She had not worked much at all with Defendant Atlanta Escrow.

75.

On May 23, 2022, Defendant Mendoza sent an email checking in on Plaintiffs.  Plaintiff Mark Lyons was recovering from COVID. She emphasized that the delay in paying the SPEI fee was a big concern for Defendants.

76.

On a call on May 24, 2022, Plaintiffs let Defendant Mendoza know that they

were going to move forward based on the conversation with Mrs. Wood, and

Plaintiffs wanted to confirm that Defendant Atlanta Escrow would wire the funds

and the wires transfers would virtually cross and Plaintiffs would receive funds

quickly after wiring. She responded with email letting Plaintiffs know that she

notified Defendant Atlanta Escrow. And she added, "they will send you the

postdated wire receipt today or as soon as the bank issues it, for the total of

$216,82.97." This was the strategy she referred to before, and it convinced

Plaintiffs that closing was about to take place.

77.

On May 25, 2022, Plaintiffs wired the funds paying the SPEI fee

$33,064.01. Plaintiffs had to move money around and sell stock causing a capital

gains tax (payable in 2023) and while the stock was down 15%.

78.

On May 25, 2022, Defendant Mendoza forwarded Plaintiffs the wire receipt

showing they wired the same day that Plaintiffs did. Plaintiffs should have received

all funds in 3 days. On June 1, 2022, Plaintiffs emailed and called Defendant

Mendoza to let her know that if Defendant Atlanta Escrow wired when they stated

they did, Plaintiffs should have their funds and no funds were transmitted.

79.

On June 7, 2022, an email from Defendant Mendoza states "no news yet." Defendant Atlanta Escrow were being  silent which has been their pattern when they are preparing a new addendum.

80.

On June 9, 2022, Defendant Mendoza forwards an email from Defendant Mark Allen, escrow officer at Defendant Atlanta Escrow, with a new Guarantee Letter addendum and no explanation.

81.

Between June 9 and June 13, 2022, Plaintiffs had several conversations with Defendant Allen, Defendant Atlanta Escrow's " international escrow officer," who told Plaintiffs that he can get the transaction completed. He provided a Letter of Guarantee with the statement - "Once the requirements mentioned hereinabove have been paid in full, we can proceed to the closing of the transaction. Mr. and Mrs. Lyons shall receive their closing package within 72 hrs."  He was referring to new **CCI Fee ($15,800)** and **10% IETU Tax ($21,680.30)** requirements being added to this transaction by Defendants.

82.

The Guarantee Letter was provided by Defendant Allen on June 13, 2022 with his personal promise that he was going to work for Plaintiffs in Mexico. Allen told Plaintiffs that he argued Plaintiffs' position that this transaction was costing Plaintiffs money for capital gains and interest and got a $7,500 compensation credit promise from Defendant Beltrones added to the addendum.

83.

On June 16, 2022, Plaintiffs let Defendant Mendoza know that Plaintiffs wired the funds and Plaintiffs would be out on a back country trip planned for almost a year and that Plaintiffs were counting on receiving funds while gone so. This transaction has strained Plaintiffs' 38 yr marriage and caused significant stress.

84.

On June 23, 2022, Plaintiffs received a brief email from Defendant Mendoza stating "The money hasn't been reflected yet to cover the requirement. I will keep you posted".

85.

On June 27, 2022, Defendant Mendoza sends an email telling Plaintiffs that Defendant Atlanta Escrow will pay the tax fee that day, which means they sat on

the funds for at least a week.

86.

On June 28, 2022, Plaintiffs received email from Defendant Calloway stating the funds were in the bank for over 60 days and Santandar Bank is charging 15% interest, basically blaming Plaintiffs for taking too long to pay. It appears now that this delay was fabricated to give Defendants an opportunity to create yet another fee that, if not paid, could mean Plaintiffs defaulted on the Purchase Contract.

87.

On July 11, 2022, Plaintiffs sent email to Defendant Allen confirming what Defendants told them was the new interest due to Santander Bank from Plaintiffs is **$39,274.99**, and detailing what was agreed to on the phone. Defendant Allen says he will go to Mexico, timed with Plaintiffs' wire payment, he gets a check from the closing and overnights those funds to Plaintiffs.

88.

On July 13, 2022, Plaintiffs let Defendant Allen know that they had sold stock and it had settled and they were prepared to wire, but needed the guarantee document first. Allen sent Plaintiffs a signed Banorte letter allowing them to write

Mark Allen a check, the wire receipt and signed addendum.  In reality, this Banorte letter was fake.

89.

July 27, 2022, two weeks from when Plaintiffs wired the 15% interest payment funds, Defendant Mendoza forwards email from Mark Allen stating he has a physical check but he can't cross the border without either paying a **$75,289 tax** or **$42,162 insurance bond** to wire it.  Plaintiffs asked Defendant Mendoza to have Beltrones pay for the bond and they can close this deal since he has to reimburse it anyway as part of the regularly amended guarantee letters.

90.

July 28, 2022, Defendant Mendoza states in an email that Defendant Atlanta Escrow informed her "If the buyer pays directly to the bank, it is a nontaxable item for the buyer, and he is willing to reimburse those funds into the escrow accounts of the Title Company, according to the Purchase Contract, so it will be a benefit to Mr. Lyons and himself."

91.

By response email, Plaintiffs let her know that Plaintiffs have no funds left.

92.

On August 1, 2022, Defendants agreed by telephone to provide a reference

for someone who just got paid, the Johnsons, to adjust the Border Tax based on what Plaintiffs have already paid, and to verify that payment of this reimbursement will be made by holding funds.

93.

On August 5, 2022, Defendant Mendoza sent a new Addendum and wire instructions and also asked if Plaintiffs were able to speak with the Johnsons, the reference. Plaintiffs wired the Insurance Bond funds after talking with Mrs. Johnson on August 8, 2022.

94.

On August 16, 2022, Defendant Mendoza forwarded an email from Defendant Allen stating that Plaintiffs' funds were returned to Beltrones' account because the account is under investigation for Money Laundering. The Mexican government wants $85,000 to complete the transaction. Defendant Atlanta Escrow is going to meet with Beltrones to figure out how to move forward.

95.

On August 18, 2022, Plaintiffs received email from Defendant Allen stating that company's board of directors and attorneys agreed that Defendant Atlanta Escrow would pay Mr. & Mrs. Lyons. But there is a **Georgia tax in the amount of $30,898.83** that needs to be paid first.

96.

On August 25, 2022, Defendant Mendoza sends email in response to many questions Plaintiffs had for Defendant Atlanta Escrow about the new Georgia Tax. Plaintiffs' accountant advised that Defendants should pay Plaintiffs with a 1099 or similar tax statement and if Plaintiffs owe taxes, Plaintiffs' will pay them. Plaintiffs' Georgia attorney advised that Plaintiffs could be contributing to fraud if Plaintiffs make a payment labeled as Georgia Tax and get it reimbursed by Beltrones. Defendants refused to speak with Plaintiffs' attorney or accountant.

97.

On September 6, 2022, Plaintiffs were forwarded email from Defendant Allen repeating that Plaintiffs need to pay the Mexico penalty of $85,000 or pay the Georgia tax and get reimbursed at closing from Defendant Atlanta Escrow.

98.

On September 21, 2022, Defendant Allen calls Plaintiffs and tells them the offer to pay out of Defendant Atlanta Escrow corporate funds expires on Sept 23, 2022. Plaintiffs ask for an extension to wire because they are trying to do this on vacation. Email forwarded from Mark Allen on September 22, 2022, granted a 4 day extension.

99.

Plaintiffs let Allen know that Plaintiffs had to borrow money to pay this Georgia tax, would be on vacation, and were wiring from a small town in Colorado.  Plaintiffs wired **$30,898.83 for the Georgia tax** on September 26, 2022.

100.

On September 26, 2022, US Bank held wire for suspected fraud since Plaintiffs were wiring such a large amount from an out of state location. Plaintiffs rewired on September 27, 2022, just making the cutoff time.

101.

On October 5, 2022, Defendant Mendoza states in an email to Plaintiffs that the funds haven't reflected on account yet.

102.

On October 6, 2022, a **Moratorium Fee** was assessed by Defendants for Plaintiffs' failure/noncompliance to make payment in the time frame specified in the Purchase Contract for the Georgia Tax.  The Purchase Contract uses language like usual and customary fees, and Defendants repeatedly used that language to exploit Plaintiffs with threats of being held in default for not paying each new fee Defendants create in this scheme.

103.

On October 7, 2022, Plaintiffs sent Defendant Atlanta Escrow a 90 day

notice as specified in the contract, for Defendants to drop the penalty and move

forward on closing the transaction. Plaintiffs shared all their frustration with Mark

Allen, stating "this is a penalty for late payment."  Plaintiffs' position is that it is

totally unfair and unethical to penalize Plaintiffs for taking too long to empty out

their bank accounts and borrow money to make the series of ridiculous tax and fee

payments.  Plaintiffs reminded him that Plaintiffs have withdrawn and borrowed

over $300,000 to sell a $43,000 timeshare.

104.

It is clear looking back now that at the same time Defendant Allen was

insisting and confirming that the Georgia Tax payment would be the final payment,

Defendants were planning the new penalty payment with Defendant Beltrones.

Plaintiffs told Allen that Plaintiffs expect him to fight for the removal of the

penalty, especially since Beltrones was going to reimburse Plaintiffs.

105.

In an email from Defendant Mendoza on October 18, 2022, she informed

Plaintiffs that Defendants have decided that the late fee will not be removed.

Defendants re-affirmed that Plaintiffs were 49 day past due and Purchase Contract stipulates 3 business days. However, she announced that Defendant Beltrones is willing to compensate Plaintiffs $20,000 "based on the credit you requested to pay your taxes…"

106.

After several calls in October 2022, Defendant Calloway agreed to ask Defendant Beltrones to reduce the penalty. Calloway stated Beltrones agreed to a 50% reduction to $17,300. The addendum was changed to that amount and was accompanied by a letter signed by the Defendant Nelson, Atlanta Escrow CEO, guaranteeing to release Plaintiffs' funds and that Beltrones committed to not asking for anymore penalties.

107.

On November 8, 2022, Guarantee letter sent with the addendum that reduced the penalty to $17,310. Signed by CEO Nelson of Defendant Atlanta Escrow. Guarantee Addendum clearly has penalty reduced to $17,310 and also kept the $20,000 compensation credit for cost burden of this transaction.

108.

On November 10, 2022, Defendant Allen sends email to Plaintiffs stating that the second half of the penalty must be paid. In a phone conversation,

Defendant Allen told Plaintiffs that Defendant Calloway was not authorized to reduce the penalty and the CEO Nelson was not aware when he authorized the signature. Plaintiffs' response was that it was their internal issue. Defendants refused to speak further with Plaintiffs about this.

109.

On January 10, 2022, Plaintiffs were sent another Guarantee Addendum that includes 2nd half of the Penalty and the reference to the additional compensation credit, accompanied by a letter from both CEOs, signed by both CEOs with clear parameters and the statement "The payment shall be made for the concept referenced hereinabove, allowing the funds to be released and reimbursed to Mr. Mark Allen and Mrs. Katherine Marie Lyons." This last reference illustrates that to the very end of this illicit financial scheme, all Defendants were acting in concert to make sure that Plaintiffs felt compelled to keep sending money to Defendants.

110.

As the last act in this scheme, coinciding with Plaintiffs sending a 90 day letter demanding that this deal either close or that Plaintiffs' funds be returned to them, Defendants created the Moratorium Fee and have been threatening to put this deal into default if Plaintiffs do not, one more time, pay the fee demanded. It is

now clear that the Purchase Contract was never going to close, with sale proceeds being distributed to Plaintiffs.  This entire transaction was a fraud and an artifice perpetrated by Defendants upon Plaintiffs.

## FIRST CLAIM FOR RELIEF

## (Federal RICO 18 U.S.C. § 1964(c))

### 111.

Plaintiffs incorporate by reference and realleges paragraphs 1 through 110 set forth above.

### 112.

Plaintiffs allege that Defendants' conduct, and the conduct of each Defendant named herein, constitutes racketeering as set forth in 18 U.S.C. § 1964(c). Specifically, Congress has defined "racketeering" to include wire fraud, or committing fraud by means of electronic transmissions over wire. The Defendants here engaged in many instances of wire fraud, including many emails and phone calls in furtherance of the fraud which have been detailed above. Plaintiffs allege two different causes of action for federal RICO violations. In summary, Section 1962(c) provides relief against parties who engage in a pattern of racketeering activity, and Section 1962(d) provides relief against those who

conspire to violate the racketeering laws. Defendants are liable under each of these three sections of the statute.

113.

18 U.S.C. § 1964(c) allows "any person injured in his business or property by reason of a violation of section 1962 of this chapter" to "sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee …."

**Count 1: Violation of 18 U.S.C. § 1962(c)**

114.

Plaintiffs incorporates by reference and realleges paragraphs 1 through 113 set forth above.

115.

18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

116.

Each Defendant, at all relevant times, is and has been a "person" within the

meaning of 18 U.S.C. § 1961(3) because each Defendant is capable of holding, and does hold, "a legal or beneficial interest in property."

117.

Defendants' activities as detailed above include at least two acts of racketeering activity since 2021. Accordingly, Defendants' conduct constitutes a "pattern" of racketeering activity. 18 U.S.C. §1961(5).

118.

Plaintiffs were deceived by Defendants' many fraudulent communications, which were done by Defendants intentionally and with full knowledge of all relevant facts and acting in concert.

119.

Defendants used the wires for the transmission and delivery of their fraudulent communications, all of which were intended to deceive, and which did deceive Plaintiffs.

120.

Defendants used the Internet and other electronic facilities to carry out the scheme and to conceal their ongoing fraudulent activities.

121.

At all times discussed herein, Defendants have been involved in a plan to to

defraud Plaintiffs, have had the intent to defraud and have willfully participated in the scheme to defraud with actual knowledge of its fraudulent nature and with specific intent to defraud, and actually used interstate wires to further Defendants' scheme.

122.

As a direct and proximate consequence of the conduct of Defendants and each of them as alleged herein, Plaintiffs have been injured and suffer monetary damages in an amount not less than $338,404, said damages to be proven at the time of trial.

123.

Because of Defendants' violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

124.

**Count 2: Violation of 18 U.S.C. § 1962(d)**

Plaintiff incorporates by reference and realleges paragraphs 1 through 123 set forth above.

125.

18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate

any of the provisions of subsection (a), (b) or (c) of this section."

126.

As alleged in the preceding sections, each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3).

127.

At all relevant times, beginning in or around July 2021, and continuing at least through the date of the filing of this Case, the Defendants and each Defendant agreed to and did conspire to violate 18 U.S.C. §§ 1962 (a) and (c), as alleged above and incorporated herein, in violation of 18 U.S.C. § 1962(d). The object of this conspiracy has been and is to commit fraud on Plaintiffs as described above; and to receive income derived from a pattern of racketeering activity and to use such income or the proceeds of such income in the establishment and operation of that enterprise.

128.

Defendants have knowingly, willfully and intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise described previously through a pattern of racketeering activity (wire fraud).

129.

Defendants have knowingly, willfully and intentionally conspired and

agreed to receive income derived from a pattern of racketeering activity (wire fraud) and to use such income or the proceeds of such income in the establishment and operation of the enterprise described previously.

130.

Defendants knew that their actions as alleged above were part of a pattern of racketeering activity and agreed to the commission of those acts to further the conspiratorial scheme described above.

131.

Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(c) and (a), in violation of 18 U.S.C. § 1962(d).

132.

As a direct and proximate consequence of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured, causing Plaintiffs to suffer monetary damages in an amount not less than $338,404, said damages to be proven at the time of trial.

133.

Because of Defendants' violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the

cost of this suit, including reasonable attorneys' fees.

134.

## Count 3 – Violations of Georgia RICO

## (O.C.G.A. § 16-14-4)

Plaintiffs incorporate by reference and realleges paragraphs 1 through 133 set forth above.

135.

Plaintiffs allege that Defendants' conduct, and the conduct of each Defendant named herein, constitutes racketeering as set forth in O.C.G.A. § 16-14-4.  Specifically, Georgia has defined "racketeering" to include such acts as mail fraud and wire fraud, the activities Defendants have engaged in here, and as an ongoing pattern of illegal activity to commit fraud against Plaintiffs.

136.

Defendants' activities and conduct as alleged above constitute a "pattern" of racketeering because they include at least two incidents of racketeering activity since July 2021 that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, including a nexus to the same enterprise, and are not isolated incidents.

137.

As a direct consequence of Defendants' conduct as alleged herein, Plaintiffs have been injured, and have suffered monetary damages in an amount not less than $338,404, said damages to be proven at the time of trial.

138.

Because of Defendants' violations of O.C.G.A. § 16-14-4 Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

139.

For the reasons stated in the preceding section, Plaintiffs are entitled to punitive damages from the Defendants, and each of them.

140.

**Count 4 - BREACH OF CONTRACT**

Plaintiffs reiterates the allegations contained in paragraphs 1-139 of this Complaint as if each were fully restated herein.

141.

DEFENDANTS's failure and refusal to close on the sale of the Timeshare Property or to return Plaintiffs' funds to them following the 90 day demand constitutes a breach of the Purchase Agreement.

142.

As a direct and proximate result of Defendants' breach of the Purchase

Contract, DEFENDANTS are liable to Plaintiffs for damages in the amount of

$338,404.00.

143.

**Count 5 – Constructive Trust**

Plaintiffs reiterate the allegations contained in paragraphs 1-142 of this

Complaint as if each were fully restated herein.

144.

Defendants are constructive trustees for the benefit of Plaintiffs under

O.C.G.A. §53-12-93 as to the funds Defendants defrauded Plaintiffs of in the

amount of $338,404.00.

145.

**Count 6 – Money Had and Received**

Plaintiffs reiterate the allegations contained in paragraphs 1-144 of this

Complaint as if each were fully restated herein.

146.

Defendants are liable to Plaintiffs in the amount of $338,404.00 for money

had and received.

147.

## Count 7 - Fraud

Plaintiffs reiterate the allegations contained in paragraphs 1- 146 of this Complaint as if each were fully restated herein.

148.

Through the conduct set forth above, Defendants made multiple misrepresentations of material fact to Plaintiffs, upon which Plaintiffs reasonably relied to their detriment. Plaintiffs is entitled to recover from Defendants the damages that they have sustained in the amount of $338,404.00.

149.

## Count 8 - Conversion

Plaintiffs reiterates the allegations contained in paragraphs 1 - 148 of this Complaint as if each were fully restated herein.

150.

Defendants have taken wrongful dominion, control and ownership over, and have enjoyed the benefits of $338,404.00 in funds belonging to Plaintiffs and converted said funds to their own use. This dominion, control and ownership has been contrary to and in derogation of the interests of Plaintiffs, and has damaged Plaintiffs in the amount of $338,404.00.

151.

Defendants' wrongful dominion, control and ownership of Plaintiffs' funds is conversion for which Defendants are liable to Plaintiffs.

152.

As a direct and proximate result of Defendants' conversion of Plaintiffs' funds, Plaintiffs has been damaged in the amount of $338,404.00, and are entitled to collect said amount from Defendants.

153.

## Count 9 – Attorney's Fees

Plaintiffs reiterates the allegations contained in paragraphs 1-152 of this Complaint as if each were fully restated herein.

154.

Defendants have acted in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense. As a result, Plaintiffs entitled to recover their attorney fees and expenses from Defendants pursuant to O.C.G.A. § 13-6-11.

## Count 10 – Punitive Damages

155.

Plaintiffs reiterate the allegations contained in paragraphs 1-154 of this

Complaint as if each were fully restated herein.

156.

Defendants actions as set forth above show willful misconduct, malice, fraud, wantonness, oppression and a want of care raising the presumption of conscious indifference to consequences, entitling Plaintiffs to an award of punitive damages against Defendants.

WHEREFORE, Plaintiffs pray for relief against Defendants as follows:

1. That Plaintiffs have judgment in the amount of $1,000,000.00, jointly and severally, from Defendants under Counts 1, 2 and 3 of this Complaint;

2. That Plaintiffs have judgment in the amount of $338,404.00, jointly and severally, from Defendants under Counts 4, 5, 6, 7, and 8 of this Complaint;

3 That Plaintiffs be awarded attorney fees from Defendants in an amount to be proven at trial under Count 9 of this Complaint;

4. That Plaintiffs have judgment under Count 10 of this Complaint against Defendants in an amount to be proven at trial;

5. That Plaintiffs recover all costs of this action from Defendants;

6. That Plaintiffs have trial by jury; and

7. For such other and further relief as this Court deems just and proper.

Respectfully submitted this 17th day of February, 2023,

 /s/  Michael Shane Welsh__
Michael Shane Welsh
Georgia Bar No. 005541

Welsh Law, LLC
6075 Barfield Road
Atlanta, GA 30328
404-890-0044
michael@welshlaw.info

2002 Summit Blvd,
Suite 300 Atlanta, GA
30319• Phone: 678-367-4813



**ATLANTA**
ESCROW &
SERVICES

## GUARANTEED ESCROW PURCHASE CONTRACT #95842/55

THIS ESCROW PURCHASE GUARANTEED CONTRACT **#95842/55** (hereinafter "Contract") created **July 29, 2021,** among **Atlanta Escrow and Exchange Services.** including its domestic and foreign employees, accounts, offices, associates and/or representatives, (hereinafter "Escrow"), **Allied Business Solutions, Inc.**(hereinafter "Company"), and **Leonardo Salinas Beltrones** (hereinafter "Buyer"), and **Mark A Lyons and Katherine  M Lyons** (hereinafter jointly and severally "Seller"), whereby Seller shall sell and Buyer shall purchase **One Bedroom available to be used Annually** at the vacation property known as **Villa del Palmar** located in **Mexico** (hereinafter "Timeshare") and with Buyer's ownership and usage commencing with **2021** Interval, hereby sets forth the following terms and conditions;

WITNESSETH:

Agreed to be performed and maintains a properly equipped staff suitable to render the services contracted for herein; and

WHEREAS, Escrow is the exclusive escrow of all Parties of this Contract/Transaction and shall provide all Parties with the customary services; and

WHEREAS, the Company represents that it holds all required legal licenses and permissions and maintains a properly equipped staffed office at 2002 Summit Blvd, Suite 300 Atlanta, Georgia, 30319, USA and has secured a bonafide Buyer of the Seller's Timeshare and the full purchase funds have been deposited into the designated Escrow/Guarantee Account; and

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, Buyer, Seller, Company, and Escrow agree as follows:

1. <u>WHEREAS CLAUSES</u>. All "WHEREAS" clauses set out hereinabove are hereinafter incorporated by reference.

2. <u>TERMS INCLUDE SINGULAR, PLURAL AND ALL GENDERS</u>. The terms "Escrow", "Company", "Buyer" and "Seller", though used in the singular, shall include the plural. All pronouns shall include the singular and plural and all genders.

3. <u>SELLER REPRESENTATIONS</u>.
A) Seller represents and warrants being the exclusive owner of the Timeshare and to have good right and lawful authority to sell, and convey said Timeshare and that said Timeshare at the time of closing this transaction shall be free and clear of encumbrances and not subject to a limitation of any kind other than stated in this Contract. Seller hereby represents and warrants that the Timeshare description is correct, and agrees to indemnify and hold harmless the Company, Escrow, and any and all others relying thereon on, as to any errors therein. Seller agrees that all liens and encumbrances, purchase balances, past due balances/ payments, maintenance fees, taxes, insurance, room service charges, and all other related costs as required by law and/or by Seller's Timeshare Contract/Legal Documents, if applicable, which must be paid prior to closing shall be deposited into escrow by the Seller via bank wire as instructed by the Company and/or Escrow a minimum of twenty (20) days prior to the scheduled closing date and/or within three (3) business days of receiving written notification by fax or email from the Company and/or Escrow of said balance due, whichever is sooner. All payment(s) made in accordance with this Agreement and which relate to this transaction and/or to vacation intervals transferring to the Buyer shall be reimbursed to Seller in full at closing by the Buyer, and Escrow shall acquire said reimbursement funds from Buyer prior to using Seller's funds for payment. Seller shall pay 5% of the Purchase/Sale Price to the Company at closing and Escrow shall deduct from Seller's proceeds and pay to the Company said 5% at Closing on behalf of the Seller. Seller agrees that during the term of this Contract or any extension thereof

**Buyer Initials:** _əＳＢ_     **Escrow Initials:** _C‿N_     **Company Initials:** _BＳ_     **Seller Initials:** _ＭＬ  Ｋَ_

July 29, 2021                                                                                                              1

**Lyons Exhibit A**

2002 Summit Blvd,
Suite 300 Atlanta, GA
30319• Phone: 678-367-4813



### GUARANTEED ESCROW PURCHASE CONTRACT #95842/55

Seller shall not lease the Timeshare or any portion thereof or otherwise encumber the Timeshare unless such leasing/encumbrance has been pre-approved by all Parties in writing.

B) Seller hereby authorizes the Company and/or Escrow and/or their designee(s) to solicit and obtain any and all information concerning the Timeshare and all encumbrances thereon and Seller agrees to execute any and all documents, to complete all procedures, and to make all payments/deposits required for this purpose and for the purpose of rendering and/or maintaining the Timeshare free and clear of all encumbrances within a minimum of twenty (20) days prior to the scheduled closing date and/or within three (3) business days of receiving written notification by fax or email from the Company and/or Escrow of said balance due, whichever is sooner.

C) Seller agrees to submit the fully-executed notarized transfer of ownership/rights document(s) with original signature(s)/initials to Escrow via Federal Express Next Day Delivery Service within three (3) business days following Seller's receipt of full clear funds. The Timeshare described herein shall be deposited to Escrow at signing and this Contract including its Addenda, Amendments, Terms and Conditions, all funds, and all documents related to and/or arising from this Contract, shall be deposited to Escrow at signing and/or as they become known to be due and shall remain in Escrow until closing and/or distribution.

4. <u>SELLER RESPONSIBILITIES</u>. Seller agrees to pay to the Company at closing 5% of the Total Purchase Price herein stated, for services rendered for the Purchase and Sale of the Timeshare, and said 5% shall be deducted from the Sale proceeds payable to the Seller by Escrow and shall be paid to the Company at closing.  No Fees shall be paid to the Company or any Agent representing the Company prior to closing.  No additional fees shall be due to the Company from the Seller other than its 5% Fee due at closing. The Seller hereby grants exclusive permission to Escrow to represent and receive monies and/or documents and/or Timeshare(s) from all Parties pertaining to the Purchase and Sale of the Timeshare(s) and/or arising as a result of this Contract, in accordance with the laws of the State of Georgia, prevailing law, the law of the land, and the terms and conditions of Seller's Timeshare Agreement/ Contract. Seller agrees to provide Escrow via Fax or electronic mail, copies of all personal information/identification required for the closing of this transaction within three (3) business days of receiving a request by Fax or electronic mail of said copies.

5. PRICE AND TERMS. All Parties hereby agree to the exclusive guaranteed purchase/sale of the Timeshare at the price of **<u>$43,500.00 USD (FORTY-THREE THOUSAND FIVE HUNDRED,00/100 U.S. DOLLARS)</u>** and upon the terms set out herein, or at any other price and upon such different terms as may be hereinafter accepted in writing by all Parties, without regard to the race, creed, color, or place of national origin of any party.

6. <u>COUNTERPARTS, FAXES AND/OR EMAILS</u>. This Contract and all documents arising from this Contract may be executed in counterparts, and all counterparts taken together shall constitute one Contract and/or one document. This Contract and all documents arising from this Contract and any and all notices and related correspondence has given hereunder may be transmitted by facsimile and/or electronic mail and shall be binding on all parties. Signatures and/or initials on this Contract and all documents arising from and/or related to this Contract sent by facsimile and/or electronic mail shall constitute original signatures and/or original initials for purposes of this Contract. This Contract and all documents arising from this document sent by facsimile and/or electronic mail containing one or more signatures and/or one or more set of initials including original, faxed and/or electronically mailed documents shall be binding on those signatories and/or on those who have affixed said initials. All notices and/or correspondence sent by Fax and/or electronic mail by any Party shall be accepted as legally delivered.

**Buyer Initials:** _a X B_   **Escrow Initials:** _C N_   **Company Initials:** _BS_   **Seller Initials:** _WL  KK_

July 29, 2021

2

2002 Summit Blvd,
Suite 300 Atlanta, GA
30319• Phone: 678-367-4813



ATLANTA
ESCROW &
SERVICES

## GUARANTEED ESCROW PURCHASE CONTRACT #95842/55

7. LENGTH OF CONTRACT. This Guaranteed Contract for the Escrow/Purchase/Sale of the Timeshare described herein shall become effective upon receipt via Fax or email by the Company and/or Escrow of a copy and/or copies of this document fully executed by all parties and shall remain in effect for One Hundred Eighty (180) days or until closing and transfer of ownership have been completed, whichever occurs first. While closings usually occur within 30-45 days after Escrow's receipt of a fully-executed Contract, closing dates may vary depending on the cooperation and timeliness of those providing the required information, documents and/or payments to Escrow.

8. USUAL AND CUSTOMARY PROCEDURES AND COSTS. The usual and customary procedures and costs for the examination of Timeshare rights and the ability to provide free and clear transfer of ownership/rights and for the closing of transactions of this nature shall apply, and the Seller agrees to deliver to the Escrow and subsequently to Buyer good and sufficient document(s) as required for the transfer of ownership/ rights to the Buyer, free and clear of all encumbrances. All Parties agree that in the event of misrepresentation or error on the part of Escrow or the Company, the injured Party/ies shall be entitled to a full refund of all fees paid to Escrow and to the Company and all out-of-pocket expenses which are related to this Contract. When governing law and/or the Timeshare Contract permit(s) fees, taxes, costs, etc. related to this transaction and/or to intervals transferring to the Buyer shall be paid directly by the Buyer. When governing law and/or the Timeshare documents require payment(s) related to this Timeshare, this transaction and/or related to intervals transferring to the Buyer to be made by Seller, Seller shall deposit funds for said payments as instructed by Escrow within three (3) business days of receiving notification and/or within twenty (20) days prior to scheduled closing, whichever is sooner, and Seller shall be reimbursed in full at closing by Buyer for all prepayments made in accordance with this Contract and directly related to this transaction and/or to intervals transferring to Buyer.

9. BUYER RESPONSIBILITIES.
A) Buyer agrees to pay at closing the International Escrow Fee equal to 10% of the Purchase/Sale Price and to pay the Company at closing 5% of the Total Purchase Price herein stated for services rendered for the Purchase and Sale of the Timeshare and said payments shall be made from funds deposited by Buyer to, and presently held by, Escrow. No part of such payments by Buyer shall come from the portion of the purchase price payable to Seller. The Buyer agrees to reimburse to Seller all payments made in accordance with this Contract by Seller that are related to this transaction and/or to vacation intervals transferring to the Buyer. The Buyer hereby grants exclusive permission to the Company and/or to Escrow, to represent and receive monies and/or documents and/or Timeshare(s) from all Parties pertaining to the Purchase and Sale of the Timeshare and/or arising as a result of this Contract, in accordance with the laws of the State of Georgia, prevailing law, the law of the land, and the terms and conditions of Seller's Timeshare Agreement/ Contract. Buyer agrees to provide Escrow via Fax or electronic mail copies of all personal information required for the closing of this transaction within three (3) business days of receiving a request by Fax or electronic mail of said copies.

B) Buyer agrees to pay at closing: a) The full Purchase/Sale Price to Seller (5% of which shall be deducted and paid to the Company on behalf of the Seller) plus all applicable reimbursements; b) The Title/Escrow/Service Fees herein stated which relate to this transaction; c) 5% Fee to the Company on behalf of the Buyer. Buyer shall deposit all known funds due at closing into Escrow upon acceptance of this Agreement and receipt of said funds is hereby acknowledged. Any additional funds discovered in the future due at closing by Buyer shall be deposited into Escrow as they become known to Buyer within a minimum of twenty (20) days prior to closing and/or within three (3) business days of receiving written notification, whichever is sooner.

C) All fees, costs, expenses, taxes, etc. related to this transaction and/or to intervals transferring to Buyer are the responsibility of the Buyer and shall be paid by Buyer whenever permitted by governing law and/or the timeshare contract. When governing law and/or the timeshare contract require payment directly from Seller, Buyer shall deposit reimbursement funds into escrow to be paid to Seller at closing.

Buyer Initials: _X_X_B_   Escrow Initials: _CN_   Company Initials: _BS_   Seller Initials: _M.S_ _KF_

July 29, 2021                                                                                                    3

2002 Summit Blvd,
Suite 300 Atlanta, GA
30319• Phone: 678-367-4813



**ATLANTA**
ESCROW &
SERVICES

---

### GUARANTEED ESCROW PURCHASE CONTRACT #95842/55

10. <u>RELIEF FOR MEDICAL EMERGENCIES, ETC.</u> Should any Party fail to comply in a timely manner with the terms and conditions contained herein due to a substantiated medical emergency and/or substantiated slow response from their Resort, said Party shall not be considered in default or in breach of contract, provided said Party exhausts every means available to comply at the earliest possible time.

11. <u>CUSTOMER SATISFACTION GUARANTEE POLICY.</u> Escrow guarantees that if, for any reason, a Party in full compliance with the Contract is dissatisfied with the service provided due to a misrepresentation or error on the part of Escrow, said Party shall be entitled to a full refund of all fees paid to Escrow; all funds in escrow deposited by said Party; all out-of-pocket expenses, and all fees paid to the Company which are related to this Contract. All Parties agree that, after providing Escrow with written, signed notification of any issue, all Parties shall provide Escrow and/or the Company with ninety (90) days to cure said issue before reporting Escrow and/or the Company to any government and/or private authority, office, agency, including but not limited to Consumer Protection, the Better Business Bureau, etc., and/or before posting any negative online comments/feedback.

12. <u>LIQUIDATED DAMAGES.</u> It is expressly understood and agreed that in the event that any Party reneges, forfeits, breaches the Contract, fails to make payment(s) as required, retracts and/or disputes any payment(s) made, Escrow shall retain as liquidated damages, any and all Escrow deposit(s) of the injuring Party/ies without further legal process required and may accept said deposit(s) as payment in full or as partial payment of ten percent (10%) Fee which would have been paid to the Company pursuant to the Purchase and Sale (5% from Seller and 5% from Buyer); all out-of-pocket expenses of all injured Party(ies) of this Contract; Title/Escrow Fees/Service Fees due to Escrow; all other relief/damages as may be determined mutually or by legal procedure; and Escrow shall distribute the balance of said deposit(s) to the injured Party(ies) as liquidated damages in direct proportion to the amount(s) that would have been received had the transaction been completed.  If said deposit(s) is/are insufficient, the injuring Party/ies must pay the difference to Escrow within ten (10) days of receiving notification so that said funds may be distributed as stated herein.
Should this transaction fail to close, all deposits/payments of all Party/ies in full compliance with this Contract shall be refunded in full to said fully-compliant Party/ies as soon as is possible, and said fully-compliant Party/ies shall receive compensation collected from the injuring Party/ies as stated in the preceding paragraph.

13. <u>PAYMENTS/PROCEEDS.</u> It is expressly understood and agreed that Escrow guarantees the Purchase and Sale of the Timeshare described herein for the Total Purchase/Sale Price of **$43,500.00 USD (FORTY-THREE THOUSAND FIVE HUNDRED,00/100 U.S. DOLLARS).** Escrow hereby confirms that the full Purchase/Sale Price funds have been deposited by the Buyer into a non-refundable Escrow/Guarantee account, thereby making the guarantee of this Contract possible. Escrow further warrants and guarantees that the Total Purchase Price, less 5% Company's Fees due from Seller, plus any and all applicable reimbursement(s), shall be paid to the Seller at closing via Cashier's Check to be sent FedEx Next Day Delivery or via Bank Wire, with the choice of payment method to be determined by Seller and Seller shall notify Escrow by email or Fax of said choice no less than seven (7) days prior to closing.

**Buyer Initials:** _αℓβ_   **Escrow Initials:** _CN_   **Company Initials:** _BS_   **Seller Initials:** _m.x VR_

July 29, 2021                                                                                                                  4

2002 Summit Blvd,
Suite 300 Atlanta, GA
30319• Phone: 678-367-4813



**ATLANTA**
ESCROW &
SERVICES

---

### <u>GUARANTEED ESCROW PURCHASE CONTRACT #95842/55</u>

14. <u>PRIVACY-NON-DISCLOSURE</u>. Escrow and the Company may not use or distribute the name and/or personal information of any Party of this Contract to any person, company or entity and agree to keep said information strictly confidential.

15. <u>INVALIDITY OF ANY CLAUSE</u>. In the event that any one or more of the provisions/clauses of this Contract shall, for any reason, be held to be legally invalid, such invalidity shall not affect any other provision/clause of this Contract and the Contract shall be fulfilled and interpreted as if the invalid provision/clause does not exist in the Contract.

16. <u>FORCE MAJEURE</u>. The Company and/or Escrow and/or any representative of the Company and/or Escrow shall not be responsible for any default caused by an Act of God, Labor Disputes, Civil Unrest, War, and/or any other circumstance beyond the reasonable control of the Company and/or Escrow.

17. <u>GOVERNING LAW</u>. This Contract and all transactions contemplated hereby shall be governed by, construed, and enforced in accordance with the laws of the State of Georgia prevailing law, the law of the land and the terms and conditions of Seller's Timeshare Agreement/Contract(s)/Legal Documents. In the event that legal action/litigation results from or arises out of this Contract or the performance thereof, the injuring Party/ies agree/s to reimburse reasonable attorney's fees, court costs, and all other expenses of the prevailing Party/ies, whether or not taxable by the court as costs, in addition to any and all other relief to which the prevailing Party/ies may be entitled.  In such event, no action shall be entertained by said court or any court of competent jurisdiction if filed more than one year subsequent to the date(s) that the cause(s) of action(s) actually occurred, regardless of whether damages were otherwise, as of said time, calculable.

18. <u>BINDING ON ALL PARTIES, ETC</u>. All covenants and agreements contained herein are binding upon all Parties hereto, and their respective heirs, successors, legal representatives and assigns as the case may be.

19. <u>POSSESSION OF TIMESHARE</u>. It is expressly agreed that the Timeshare(s) described herein shall be deposited into Escrow at signing and shall be held by Escrow until closing and/or distribution.

20. <u>ASSIGNMENT OF CONTRACT</u>. No Party may assign this Contract without the express written consent of all parties.

21. <u>ENTIRE AGREEMENT</u>. This Contract contains the entire agreement of the Parties and no prior or future oral or written statements or additional agreements shall have any force and/or effect unless such modification is executed in writing, signed by all Parties hereto in the form of an Addendum to this Contract, and submitted to Escrow by fax or email.

**Buyer Initials:** _____   **Escrow Initials:** _____   **Company Initials:** _____   **Seller Initials:** _____

July 29, 2021                                                                                                5

2002 Summit Blvd,
Suite 300 Atlanta, GA
30319• Phone: 678-367-4813



**ATLANTA**
ESCROW &
SERVICES

---

### GUARANTEED ESCROW PURCHASE CONTRACT #95842/55

By signature below, I/we acknowledge that I/we have read, understood, and accept the terms and conditions of this Contract.

Accepted by Buyer by the authorized signatory/ies below on July 29, 2021

Signature of Leonardo Salinas Beltrones, Buyer

Accepted by Escrow by the authorized signatory below on July 29, 2021

Signature of Charles Nelson, President Atlanta Escrow & Exchange Services, INC.

Accepted by Company by the authorized signatory below on July 29, 2021

Signature of Blake Shipley, CEO Allied Business Solutions, INC.

Accepted by Seller by the authorized signatories below on _____8/2/_____, 2021:

Signature of **Mark A Lyons**, Seller

Signature of **Katherine M Lyons**, Seller

**Buyer Initials:** _____  **Escrow Initials:** _____  **Company Initials:** _____  **Seller Initials:** _____

July 29, 2021                                                                                          6